# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

HARALD MCPIKE,

        Plaintiff,

        v.

ZERO-GRAVITY HOLDINGS, INC. f/k/a
SPACE ADVENTURES, LTD., THOMAS
SHELLEY and ERIC ANDERSON,

        Defendants.

Case No. 1:17cv562-TSE/JFA

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION *IN LIMINE* NO. 4
REGARDING MCPIKE'S SPOLIATION OF DOCUMENTS**

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................... i

TABLE OF AUTHORITIES ..................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................1

FACTUAL BACKGROUND .....................................................................................................2

    A.    Plaintiff's Document Preservation and Collection Efforts Were Deficient ............2

        1.    Plaintiff Never Instituted a Litigation Hold ...................................................2

        2.    Plaintiff Did Not Collect Documents Until Long After He First
            Anticipated Litigation .....................................................................................3

        3.    Plaintiff's Belated Document Collection and Production Efforts
            Were Woefully Inadequate ..........................................................................5

        4.    McPike's Aberrant Discovery Practices Appear Designed To
            Deprive Defendants of Relevant Evidence ...................................................6

    B.    Plaintiff's Flawed Document Preservation, Collection, and Production
        Efforts Have Denied Defendants Important Discovery. .........................................6

    C.    Plaintiff Provided Conflicting Responses to Interrogatories Regarding His
        Preservation and Collection Efforts. .....................................................................11

        1.    Plaintiff's Supplemental Responses Conflict with His Original
            Responses in Key Respects ..........................................................................12

        2.    McPike's Supplemental Responses Confirm He Knowingly
            Flouted His Discovery Obligations ..............................................................13

LEGAL STANDARD ...............................................................................................................14

ARGUMENT .............................................................................................................................16

CONCLUSION ..........................................................................................................................18

## TABLE OF AUTHORITIES

### CASES

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 803 F. Supp. 2d 469 (E.D. Va. 2011)................................................................................................................................14

*Flame S.A. v. Indus. Carriers, Inc.*, 2014 WL 3895933 (E.D. Va. Aug. 8, 2014), *objections overruled*, 39 F. Supp. 3d 752 (E.D. Va. 2014), *aff'd sub nom.*, *Flame S.A. v. Freight Bulk Pte. Ltd.*, 807 F.3d 572 (4th Cir. 2015) ........................................15

*Jenkins v. Woody*, 2017 WL 362475 (E.D. Va. Jan. 21, 2017) ....................................................15

*Linlor v. Polson*, 2017 WL 7310076 (E.D. Va. Dec. 6, 2017) (Anderson, MJ) ............................15

*Muhammad v. Mathena*, 2016 WL 8116155 (W.D. Va. Dec. 12, 2016)......................................15

*Newman v. Borders, Inc.*, 257 F.R.D. 1 (D.D.C. Apr. 6, 2009)....................................................14

*Rosemond v. United Airlines, Inc.*, 2014 WL 4245974 (E.D. Va. Aug. 26, 2014)................15, 17

*Silvestri v. GMC*, 271 F.3d 583 (4th Cir. 2001)...............................................................13, 14, 17

*Slaydon v. Water Country USA*, 2016 WL 8243174 (E.D. Va. Jan. 6, 2016), *aff'd*, 667 F. App'x 381 (4th Cir. 2016) ........................................................................................15, 17

*Swimways Corp. v. Aqua-Leisure Indus., Inc.*, 2017 WL 3262135 (E.D. Va. July 31, 2017) ..............................................................................................................................15

*Vir2us, Inc. v. Invincea, Inc.*, 235 F. Supp. 3d 766 (E.D. Va. 2017) ............................................15

*Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212 (S.D.N.Y. 2003)................................................16

*Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422 (S.D.N.Y. 2004)................................................16

## PRELIMINARY STATEMENT

Defendant Zero Gravity Holdings, Inc., formerly known as Space Adventures, Ltd. ("Space Adventures"), hereby moves *in limine* under Rule 37(e) of the Federal Rules of Civil Procedure for discovery sanctions against Plaintiff Harald McPike, including jury instructions regarding issues for which evidence was not made fully available to Defendant because of Plaintiff's spoliation of electronically stored information ("ESI").

Plaintiff has gone to great lengths to deprive Defendant of fair and complete discovery. As just one egregious—and uncontested—example, Plaintiff called his former employee and current contractor Daniel Phalen on his cell phone the night before Phalen's deposition. It was the only time Phalen recalls Plaintiff ever calling him on his cell phone during his years as Plaintiff's employee and consultant. The reason for the urgent call? Plaintiff called to admonish Phalen that during his deposition the next day he should "mention as few names as possible" and "remember" that Plaintiff was not aware of certain facts until 2016 (a key date for Plaintiff's now abandoned fraud claims). Plaintiff does not dispute the truthfulness of Phalen's testimony. Instead, his only response has been that his efforts to improperly influence Phalen's testimony failed: "There is no evidence that Dr. Phalen's deposition testimony was influenced by McPike's telephone call in any way." Dkt. 123 at 12 (Pl.'s Mem. in Opp'n to Defs.' Mot. to Compel). Astounding. Plaintiff also hid important evidence behind phony claims of privilege— a ploy he has gotten away with in other federal litigation—delaying production of key documents for months and requiring the reopening of depositions after Defendants successfully compelled production. Beyond those examples of malfeasance, discovery in this case has uncovered other serious misconduct and derelictions, including Plaintiff's and his counsel's disregard of document preservation and collection obligations under federal law and the rules of this Court, which have denied Defendant the discovery it is entitled to on critical issues.

1

The rules governing discovery apply equally to all parties—even offshore billionaires like Plaintiff. Because his discovery abuses have interfered with the development of evidence in this action in critical respects, the jury ought to be instructed that:

1)      Plaintiff improperly sought to influence witness testimony;

2)      Plaintiff failed to properly preserve documents, and if those documents had been properly preserved and offered into evidence, it may be presumed they would have been unfavorable to Plaintiff; and

3)      If the jury is asked to determine factual issues regarding the parties' meeting of the minds expressed in Plaintiff's Circumlunar Space Flight Purchase Agreement, it shall be presumed that Plaintiff was aware of the publicly-available information that his team's diligence would have uncovered in 2013 regarding the relationship and roles of Russian space program entities Energia and Roscosmos with respect to commercial spaceflight.

## FACTUAL BACKGROUND

**A.**    **Plaintiff's Document Preservation and Collection Efforts Were Deficient**

**1.**    **Plaintiff Never Instituted a Litigation Hold**

Plaintiff confirmed in testimony that he never undertook any efforts whatsoever to preserve any documents in this case. Ex. 1 (McPike Dep.) at 82:15–83:22, 111:16–112:2. Plaintiff's billion-dollar, international hedge-fund organization in the Bahamas "does not have a formal policy in relation to document destruction, preservation, or archiving," Ex. 2 (McPike Resps. to Def. Anderson's Second Interrogs.), at 2; Ex. 3 (Mawdsley Dep.) at 160:18–24; neither Plaintiff nor his litigation counsel ever sent a preservation notice or litigation hold to his custodians or other employees. *Id.* at 161:24–162:12 ("[W]hen we start to consider bringing and action . . . . we don't say—we don't say, 'Don't delete.'"). Plaintiff's company does not have "a

policy in place that prohibits people from deleting emails." *Id.* at 160:18–24. No computers were forensically imaged (or imaged at all). The only review of the custodians' emails was done by McPike's employees themselves, who were left to self-identify what they thought was "relevant." Nothing was done to quality check the employees' efforts to self-identity documents responsive to Defendants' requests, and again, nothing was done to stop documents from being destroyed at any point from 2012 through today. *Id.* at 162:8–16.

Defendant is asked to accept the bald assertion that "in practice as to the identified custodians, materials, including emails, as not destroyed and are retained." Ex. 2 (McPike Resps. to Def. Anderson's Second Interrogs.) at 2. But Plaintiff's company does not have anyone "who's monitoring employees to make sure they're not deleting emails," Ex. 3 (Mawdsley Dep.) at 160:25–161:4, and Plaintiff's advisor Craig Mawdsley scoffed at the idea that anyone would monitor their boss, Plaintiff, to ensure that he was not deleting emails, *id.* at 161:5–17.

## 2. Plaintiff Did Not Collect Documents Until Long After He First Anticipated Litigation

Years before he filed this action for fraud and breach of contract in May 2017, Plaintiff anticipated litigation against Space Adventures, yet he did not take any steps to preserve, much less collect, relevant documents until much later. According to his original, sworn responses to interrogatories, Plaintiff first began to collect documents in June 2017, a month ***after*** filing his complaint; he later changed that response, testifying that he collected certain unspecified documents from two employees (but not McPike's own documents) in December 2016. By Plaintiff's own admission, he first anticipated litigation in October 2016, months before taking steps to preserve or collect documents. Discovery in this case makes clear, however, that Plaintiff was considering suing Space Adventures as early as 2014, when he (1) became

dissatisfied with his bargained-for risk allocation under his Agreement and decided to not make any further payments to Space Adventures unless it renegotiated his deal, Ex. 4 (McPike Dep.) at 628:14–629:19; (2) learned that another Space Adventures customer had made nearly identical allegations to Plaintiff's and consulted with his litigation counsel at Seward & Kissel in New York, Ex. 3 (Mawdsley Dep.) at 361:8–24; Ex. 5 (McPike Privilege Log); (3) engaged private investigators in New Jersey and Florida to evaluate Defendant Anderson and Space Adventures, Ex. 6 (MCPIKE005744); Ex. 7 (MCPIKE003720); and (4) hired a PR specialist in London to handle any public fallout, Ex. 3 (Mawdsley Dep.) at 402:15–405:6; Ex. 4 (McPike Dep.) at 669:4–675:1; Ex. 8 (MCPIKE005717).  All of this occurred in 2014, yet Plaintiff allowed years to pass before taking any steps to preserve or collect documents.

In June 2015, Plaintiff expressly threatened to sue Space Adventures for supposedly giving more favorable contract terms to another passenger, Ex. 9 (MCPIKE000880), but again, took no action to preserve or collect his or his employees' or agents' documents.

Even in October 2016, when Plaintiff claims he first decided to sue Space Adventures and consulted his long-time litigation counsel, Seward & Kissel, about potential causes of action, Ex. 10 (MCPIKE006334); Ex. 5 (McPike Privilege Log), he took no steps to preserve or collect documents.  Ostensibly, Plaintiff and his lawyers spent the next seven months preparing his complaint and mapping out litigation strategy, as they did not seek to confirm their factual allegations or resolve this issue at all with Space Adventures before filing this action.  Ex. 3 (Mawdsley Dep.) at 31:8–32:18; 349:7–350:2; Ex. 8 (MCPIKE005717).  During those months, Plaintiff and his counsel took ***no steps*** to preserve documents.  Plaintiff's testimony on this point could not be clearer:

> Q:  Okay. At -- at any point in time, has anyone told you you needed to preserve documents for this lawsuit?

A: No.
Q: Okay. Have you ever given any direction to your employees that they should preserve documents for this lawsuit?
A: No.
Q: Have you given any direction to your IT guy that he should discontinue the normal deletion procedures at your companies?
A: No.

Ex. 1 (McPike Dep.) at 82:15–83:22, 111:16–112:2.  Plaintiff involved many of his employees or consultants in issues related to Space Adventures since 2012, but neither Plaintiff nor his litigation counsel ever, at any point, took steps to ensure preservation of his or his employees' or advisors' documents for this action, aside from his employees' fragmentary and *ad hoc* self-collection of documents.  Ex. 11 (McPike Suppl. Resps. to Def. Anderson's Second Interrogs.).

### 3. Plaintiff's Belated Document Collection and Production Efforts Were Woefully Inadequate

Plaintiff's collection "efforts" seem to have been designed to fail, given the haphazard way in which they were conducted.  As described in deposition testimony of his employees, Plaintiff's approach to document production were, at best, arbitrary and *ad hoc*, as employees were asked to self-identify relevant documents and send them to counsel.  Ex. 3 (Mawdsley Dep.) at 152:11–168:6.  Initially, Plaintiff's team was provided an undisclosed, narrow definition of what to look for, and only a few employees were even asked to look.  *Id.*; Ex. 12 (Email from M. Meier to J. McNichols (Jan. 8, 2018)).  Later, more employees were asked to look, and the definition apparently was broadened, but Plaintiff and his employees and advisors were still left to their own devices to search for, review, and send relevant documents to counsel.  Ex. 3 (Mawdsley Dep.) at 162:20–164:15.  Unlike Defendants, Plaintiff did not retain an e-discovery vendor to conduct a forensic collection of the relevant electronic devices, nor did they apply search terms in any centralized or coordinated effort to locate potentially responsive documents for attorney review.  Plaintiff's process, if it can be called one, began late and continued until

*one week after the close of discovery—ten months after filing the Complaint*. *Id.* at 156:17–24;

Ex. 2 (McPike Resps. to Def. Anderson's Second Interrogs.) at 2–3; Ex. 11 (McPike Suppl.

Resps. to Def. Anderson's Second Interrogs.) at 3–7.

      **4.**      **McPike's Aberrant Discovery Practices Appear Designed To Deprive**
               **Defendants of Relevant Evidence**

      Under some circumstances, these failings might appear accidental or simply careless, but

Plaintiff is a savvy and sophisticated businessman with a U.S.-based, 180-lawyer litigation firm

from New York City on retainer since at least 2012 for his dealings with Space Adventures and

other disputes.  And, as the Court is aware, he has a history in this case of (1) attempting to

improperly influence the testimony of his employees, all of whom are dependent on him for their

livelihoods, Ex. 13 (Phalen Dep.) at 199:6–203:21, 304:6–22, and (2) withholding key

documents behind a spurious claim of attorney-client privilege over non-lawyer Mawdsley.

Dkt. 83 (Feb. 9, 2018 Order).  As described below, Plaintiff's failures to preserve or collect

relevant documents have resulted in substantial gaps in his productions that coincide with key

timeframes and events that could be dispositive of this matter.  Given Plaintiff's other conduct, it

strains credulity to believe his shoddy document collection and production efforts (and failure to

institute any preservation) were merely accidental.

**B.**      **Plaintiff's Flawed Document Preservation, Collection, and Production Efforts Have**
       **Denied Defendants Important Discovery**

      Plaintiff's disregard for his duties has denied Defendant discovery on key topics.  If his

lone remaining warranty claim somehow survives summary judgment, the parties will present to

the Court and the jury evidence regarding, among other things:

      1.      What did the parties understand at the time of contracting about the nature of the

               services to be provided and the context of the relationships between and among

               Space Adventures, Energia, and Roscosmos?  What did Plaintiff's team learn in

their pre-contractual diligence before McPike committed $150 million to this development project?

2. If the Court rules that parol evidence may be admitted,[1] what did the parties communicate to each other during the negotiations? What did Plaintiff's team tell him that informed his understanding of the contract?

3. Plaintiff repudiated the contract in 2014 and Space Adventures sent him a formal notice of termination in March 2015. Why did Plaintiff quit? What was discussed internally on Plaintiff's team about his decision to stop paying Space Adventures in 2014? McPike testified that Space Adventures fulfilled all of its obligations under the contract, so what led him to abandon the contract and his $7 million non-refundable deposit?

Discovery has provided some clues about important documents touching each of these topics that Defendant has been denied access to because they either were lost, destroyed, or simply missed because of Plaintiff's shoddy document collection (and failure to undertake any document preservation efforts). For example:

- **<u>Failure To Produce Documents Reflecting Pre-Contractual Diligence</u>**. Plaintiff is a very sophisticated and successful investor. He has a team of professional employees and consultants who assist his business. He testified he cannot recall the specifics, but he would have expected his team to have conducted diligence before he agreed to a $150 million Agreement with Space Adventures to pursue his stated goal of flying to the International Space Station and then on around the earth's moon on a specially modified Russian Soyuz

---

[1] As noted in Defendant's Memorandum in Support of its Motion for Summary Judgment, Defendants believe the contract is unambiguous and that parol evidence is irrelevant.

launch vehicle. Ex. 1 (McPike Dep.) at 89:8–12. The record reveals that Plaintiff's employees and consultants, including employees fluent in Russian, conducted ongoing diligence after the Agreement was entered. But Plaintiff produced **no** documents reflecting any pre-contractual diligence his team conducted of Space Adventures or the Russians or the Soyuz or circumlunar space travel. This is noteworthy, particularly given the emphasis Plaintiff is now making on understanding the relationships between and among Space Adventures and its Russian partners.

Plaintiff's expert witness Dr. Eligar Sadeh testified in his deposition that a number of key aspects of the potential circumlunar mission aboard a modified Russian Soyuz vehicle were well known in 2012 and 2013. The diligence conducted by McPike's team in 2012 through 2013 before he committed $150 million would have made McPike aware of these facts. First, Dr. Sadeh testified that when Plaintiff executed his Agreement with Space Adventures in March 2013, it was clear that the anticipated mission was at the very early stages, which he referred to as the "concept study" phase, the "primar[y]" goal of which was to determine the mission's "technical feasibility." Ex. 14 (Sadeh Dep.) at 30:20–33:18. Dr. Sadeh recognized that the Lunar System Design Review ("LSDR") contemplated in Plaintiff's Agreement was a "technical feasibility study that is part of that initial project phase, the preliminary design phase of a project." *Id*. at 24:6–24; *see also id*. 98:18–100:22.

Second, Dr. Sadeh testified that the LSDR phase for a commercially developed and funded project with Energia would end with a "formal close out" process before moving to the engineering phase where something is "actually buil[t]." *Id*. at 32:5–34:10. Dr. Sadeh testified it would only be during this "close out" stage of the LSDR that Roscosmos—the

"licensing authority"—would be asked by Energia for "authority . . . to move forward." *Id.*
at 34:14–36:13.

Third, Dr. Sadeh testified that at the "close out" stage of the LSDR Roscosmos would not
only consider the "technical feasibility" of the mission, but also its "financial wherewithal,"
which was admittedly of particular importance here, "because you're talking about private
capital versus, you know, Russian government money, federal money." *Id.* at 35:13–19.
Accordingly, Dr. Sadeh testified "in order to move forward with th[e] closeout of a
commercially funded project," Energia would have to show a "committed source of funding"
to Roscosmos. *Id.* at 35:21–36:13. Dr. Sadeh testified that "the licensing authority
[Roscosmos] would want to know [Energia] ha[s] the money to be able to do the project"
before approving its advance to future stages of development. *Id.* at 36:15–18; *see also id.* at
49:25–51:2.

Finally, Dr. Sadeh testified that Plaintiff would not individually be "sponsored" or
"authorized" by Roscosmos to fly on an actual circumlunar mission until much later in the
project. *Id.* at 160:23–161:17, 162:7–164:24, 166:15–167:2, 172:7–173:11. Dr. Sadeh
testified that sponsorship or "authoriz[ation] to fly by Roscosmos" of Plaintiff would occur
"once the hardware [wa]s built and ready to go" and after "training" and "medical"
clearance. *Id.*

Importantly, for each of these points, Dr. Sadeh testified that if Plaintiff had asked about
these particular details in 2012 or 2013, he would have been able to tell them as much. *See
id.* at 31:21–32:2, 88:16–21, 98:18–100:22, 145:19–25, 166:15–167:2.

These facts utterly undercut Plaintiff's argued interpretation of Section 3.09, that he was
sold a "seat" on circumlunar mission that Roscosmos was legally bound to approve (or had

approved).  By failing to produce or preserve his diligence documents, Plaintiff denied
Defendant the ability to prove through documents what it knows as fact: Plaintiff's argument
for interpretation is *post hoc* and made-for-litigation, as no sentient person who was aware of
the context of the contract in 2013 could ever have understood it the way Plaintiff now
claims he did.

- **Failure to Produce Mawdsley's Pre-Meeting Notes from Contract Negotiations with
Space Adventures in 2012-2013**.  Plaintiff relied, in part, on Mawdsley in negotiating with
Space Adventures.  Plaintiff and Mawdsley both testified that Mawdsley's duties included
providing talking points to Plaintiff before important meetings and calls and taking notes of
what was said during important meetings and calls.  *See, e.g.*, Ex. 4 (McPike Dep.) at
677:12–15.  Plaintiff produced some pre-call notes from later in the relationship, *see, e.g.*,
Ex. 15 (MCPIKE006367), but none from the 2012 to 2013 period when the Agreement was
negotiated.

- **Failure To Produce Mawdsley Notes from Later Important Meetings**.  Mawdsley
took handwritten notes of important calls and meetings in a series of notebooks.  Ex. 3
(Mawdsley Dep.) at 168:15–170:17.  For this litigation, Mawdsley personally—but without
supervision or the involvement of an actual lawyer—reviewed his own notebooks and
scanned the pages he thought were relevant.  *Id.*  He then provided those self-selected scans
to Seward & Kissel, boxed up the notebooks, and put them in storage at his home in New
Zealand.  Seward & Kissel never asked to obtain the notebooks, and no lawyer has seen the
complete notebooks or played any role in determining what content should be collected for
production in response to Defendant's requests.  After prevailing on a motion to compel that
exposed the fact Mawdsley was masquerading as a lawyer and was not protected by the

privilege, Defendant received 15 pages of Mawdsley's handwritten notes relating to various events spanning 2012 to 2015.  But Defendant received no notes reflecting, *inter alia*, (1) meetings or calls regarding the *Moscow Times* article; (2) meetings or calls with third parties Plaintiff enlisted to make direct contact with the Russians; (3) meetings or calls with various outside consultants who were assisting Plaintiff in his dealings with Space Adventures or separately with the Russians; (4) meetings or calls with the public relations firm Plaintiff hired in October 2014 in anticipation of Space Adventures terminating his contract because he refused to make further payments; or (5) Plaintiff's 2015 threats to sue Space Adventures.  It is simply not plausible that these notes do not exist.

- **Failure To Produce Internal Plaintiff Team Communications Regarding Termination of the Agreement**.  On March 24, 2015, Space Adventures terminated the Agreement, after Plaintiff defaulted and did not make any payments after the initial non-refundable deposit.  Certainly this was an important event within the McPike team, yet he did not produce even one substantive, contemporaneous internal email or note regarding the termination.

These are, unfortunately, only examples of some of the harm caused by Plaintiff's failure to properly preserve and produce documents.

## C.  Plaintiff Provided Conflicting Responses to Interrogatories Regarding His Preservation and Collection Efforts

In light of the obvious defects in Plaintiff's production, former Defendant Anderson served four interrogatories on Plaintiff relating to document preservation and production on January 24, 2018.  On February 23, 2018, Plaintiff provided thin, extremely superficial responses.  Anderson complained and filed a motion to compel.  On March 7, 2018, McPike

served supplemental responses.[2]  The new responses made matters worse, providing inconsistent and flatly contradictory evidence and leaving many questions unanswered.

### 1. Plaintiff's Supplemental Responses Conflict with His Original Responses in Key Respects

In his original sworn interrogatory responses, Plaintiff testified that (1) the first searches of his and his custodians' ESI were conducted in June 2017, the month **after** he filed the Complaint in this action; and (2) three subsequent waves of searches were conducted in December 2017 and January and February 2018 of various custodians' files.  Ex. 2 (McPike Resps. to Def. Anderson's Second Interrogs.).  Twelve days later, Plaintiff served new interrogatory responses that tell a dramatically different tale.  Now, Plaintiff (or Mawdsley) swears that the initial searches of some custodians' ESI were conducted in December 2016, and instead of three subsequent waves of searches listed in the initial responses, there now appear to have been six waves.  Ex. 11 (McPike Suppl. Resps. to Def. Anderson's Second Interrogs.) at 4–7.  In addition, several of the searches that Plaintiff swore to in his initial responses—for key custodians Mawdsley, Phalen, Wolfgang Beirl, and Marcus Traill—seem never to have happened at all, as they are not included in the new response.  *Compare* Ex. 2 (McPike Resps. to Def. Anderson's Second Interrogs.) at 3–5, *with* Ex. 11 (McPike Suppl. Resps. to Def. Anderson's Second Interrogs.) at 5–7.[3]

---

[2] Plaintiff personally verified his initial interrogatory responses, but his supplemental responses were signed by Mawdsley, not McPike.  Plaintiff has provided no explanation for his inability or unwillingness to sign the responses.

[3] The shifting dates of searches is particularly troublesome in the case of Beirl.  Plaintiff testified in his supplemental response that Beirl's "hard disk crash[ed]" and had to be "replaced," impliedly in early 2017, Ex. 11 (McPike Suppl. Resps. to Def. Anderson's Second Interrogs.) at 5.  Plaintiff swore in his original response that "Beirl's emails and computer were searched for data relating to this Action . . . in or around June 2017, which would appear to have been after it crashed.  Ex. 2 (McPike Resps. to Def. Anderson's Second Interrogs.) at 4.  But Plaintiff now claims that Beirl self-"searched his hard drive for documents in December 2016."  Ex. 11

In a similar vein, while Plaintiff testified in his initial response that his email server was "first put into use" on May 30, 2015 (after the relevant events in this case), with a backup existing of that date and "full backups . . . performed every week and incremental backups every day" thereafter, Ex. 2 (McPike Resps. to Def. Anderson's Second Interrogs.) at 2, he now swears that his "email server was first installed in 2010" and that it only "archives emails that are marked for archiving by users on a weekly basis dating back to June 2015."  Ex. 11 (McPike Suppl. Resps. to Def. Anderson's Second Interrogs.) at 3.

## 2. McPike's Supplemental Responses Confirm He Knowingly Flouted His Discovery Obligations

What is clear from the face of ***both*** of Plaintiff's sets of interrogatory responses is that he ignored important discovery obligations:

- He did not institute any litigation hold, either formal or informal.  Under the law of this Court, this fact alone could amount to spoliation.  *See Silvestri v. GMC*, 271 F.3d 583, 590 (4th Cir. 2001);

- He did not take any steps to preserve custodians' documents when he anticipated litigation;

- He conducted a scattershot, unsupervised, and *ad hoc* document collection effort, resting entirely on either self-collection by the custodians themselves, or collections by clerical staff, Plaintiff's IT manager, or Plaintiff's IT associate; and

---

(McPike Suppl. Resps. to Def. Anderson's Second Interrogs.) at 5.  Had Plaintiff adequately preserved Beirl's device when he claims to have first anticipated litigation in October 2016, the contents of Beirl's device would have been available when Defendants first served document requests at the outset of discovery in November 2017.  Instead, Plaintiff produced fewer than 40 documents that list Beirl as a custodian, despite the fact that Beirl was one of Plaintiff's lead advisors on the lunar project for years, even traveling with him to Russia for important meetings with Space Adventures and its Russian counterparties.

- Plaintiff did not engage any third-parties to image computers or forensically collect documents, as is typically done in a case of this magnitude.

Plaintiff has admitted he "understands his discovery obligations," Dkt. 123 at 16 (Pl.'s Mem. in Opp'n to Defs.' Mot. to Compel), and well he should. He is sophisticated and has been represented throughout by experienced counsel. One can only take from this that his failures to abide by the most rudimentary procedures and safeguards were intended to frustrate Defendant's rights to receive timely and complete discovery.

## LEGAL STANDARD

A party's document preservation and production efforts (or lack thereof) are fair subjects of discovery. *Newman v. Borders, Inc.*, 257 F.R.D. 1, 3 (D.D.C. Apr. 6, 2009). A party has a duty to preserve potential evidence "not only during litigation but also [during] that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation." *Silvestri v. GMC*, 271 F.3d 583, 591 (4th Cir. 2001) (internal citations omitted). "Of course a party moving for sanctions cannot be expected to demonstrate with certainty to content of destroyed documents . . . that responsibility falls on the shoulders of the adverse party." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 803 F. Supp. 2d 469, 498–99 (E.D. Va. 2011) (internal citations and quotation marks omitted). The relevance of lost or destroyed documents is presumed when the record shows, as here, that the spoliator acted intentionally or willfully. *Id.* at 499. "[I]f the record shows that a party destroyed or materially altered documents or materials in bad faith, that establishes, without more, that the destroyed documents or materials were relevant." *Id.* "[I]n order to rebut the presumption of relevance, the alleged spoliator must present *clear and convincing* evidence demonstrating that the spoliated material or documents were of minimal or little import." *Id*

Rule 37 establishes the framework for imposing sanctions on a party who has failed to properly preserve or produce ESI to the detriment of his opponent:

> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may: (A) presume that the lost information was unfavorable to the party; (B) instruct the jury that it may or must presume the information was unfavorable to the party; or (C) dismiss the action or enter a default judgment.

*Linlor v. Polson*, 2017 WL 7310076 at *1 (E.D. Va. Dec. 6, 2017) (Anderson, MJ) (quoting Fed. R. Civ. P. 37(e)). The Court enjoys broad discretion in fashioning an appropriate sanction where spoliaiton has occurred. *Id.* (citing *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 199 F. Supp. 3d 958, 986 (E.D. Va. 2016), *aff'd in relevant part, rev'd in part*, 881 F.3d 293 (4th Cir. 2018). Appropriate sanctions for spoliation can run the gamut from awarding fees and costs in cases where the destruction is unintentional, *see, e.g.*, *Vir2us, Inc. v. Invincea, Inc.*, 235 F. Supp. 3d 766, 780 (E.D. Va. 2017); *Swimways Corp. v. Aqua-Leisure Indus., Inc.*, 2017 WL 3262135, at *5 (E.D. Va. July 31, 2017), to instructing the jury regarding a party's misconduct or presumptions the jury should make regarding the evidence, *see, e.g.*, *Jenkins v. Woody*, 2017 WL 362475, at *18–19 (E.D. Va. Jan. 21, 2017); *Muhammad v. Mathena*, 2016 WL 8116155, at *9 (W.D. Va. Dec. 12, 2016), *report and recommendation adopted*, 2017 WL 395225 (W.D. Va. Jan. 27, 2017); *Flame S.A. v. Indus. Carriers, Inc.*, 2014 WL 3895933, at *13 (E.D. Va. Aug. 8, 2014), *objections overruled*, 39 F. Supp. 3d 752 (E.D. Va. 2014), *aff'd sub nom.*, *Flame S.A. v. Freight Bulk Pte. Ltd.*, 807 F.3d 572 (4th Cir. 2015), to, in the most egregious case, entering judgment against the spoliator, *see, e.g.*, *Slaydon v. Water Country USA*, 2016 WL 8243174, at *2–3 (E.D. Va. Jan. 6, 2016), *aff'd*, 667 F. App'x 381 (4th Cir. 2016); *Rosemond v. United Airlines, Inc.*, 2014 WL 4245974, at *9 (E.D. Va. Aug. 26, 2014).

# ARGUMENT

Plaintiff engaged Seward & Kissel in 2012 to advise him in his relationship with Space Adventures. Ex. 5 (McPike Privilege Log). Seward & Kissel have been working alongside Plaintiff ever since. *Id.* Plaintiff's failure to institute any document preservation measures is shocking in a case of this magnitude where Plaintiff, a sophisticated party represented by experienced litigation counsel, was originally asserting claims for more than $21 million, as well as punitive damages.[4] Plaintiff and his counsel did not preserve documents in 2014 when Plaintiff first anticipated litigation. They did not preserve documents in 2015 when he threatened litigation. They did not preserve documents in 2016 when he admittedly began preparing this litigation. They did not preserve documents in 2017 when they filed this litigation. And they have not preserved documents to this day (even after receiving interrogatories on the topic). This behavior goes well beyond neglect or recklessness.

Plaintiff and his counsel's collection and production efforts are not much better. Depending on whether one believes Plaintiff's original sworn interrogatory responses or the later set that Mawdsley signed, Plaintiff either did not begin collecting *any* documents until *after* filing suit, or at best delayed starting his document collection for months after deciding in

---

[4] As a gauge of what is expected in this type of case, Judge Scheindlin's decisions in the *Zubulake v. UBS Warburg LLC* cases are instructive. *See*, *e.g.*, *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 215 & n.3 (S.D.N.Y. 2003) (collecting cases). In one of the decisions, the Court noted that "it is *not* sufficient to notify all employees of a litigation hold and expect that the party will then retain and produce all relevant information. Counsel must take affirmative steps to monitor compliance so that all sources of discoverable information are identified and searched." *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 432 (S.D.N.Y. 2004). Plaintiff did none of this. In contrast, non-party Space Adventures and its executives Anderson and Shelley paid their outside discovery vendors more than $87,000 for document preservation, collection, and production (in addition to the attorney time spent manually reviewing more than 90,000 documents that hit on a broad set of search terms for responsive documents for relevance and privilege). Ex. 17 (Dkt. 129-12 (Fields Decl.)) ¶ 7. A tidy sum, to be sure, but for a billionaire like Plaintiff who was suing originally for tens of millions, it is well within reach.

October 2016 to sue Space Adventures, but even then only collected from two custodians—and not even from Plaintiff. Slowly he added additional custodians and slowly he purportedly conducted (or had his employees self-conduct) broader searches with additional search terms, conducting recent searches in 2018 after depositions had commenced. His final search and collection to-date occurred in March 2018, a week after the close of discovery. And to reiterate, Plaintiff was represented by experienced and able litigation counsel throughout this period. These failings cannot be chalked up to accident or ignorance. They were intentional.

The Fourth Circuit defines spoliation as "the destruction or material alteration of evidence or to *the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation*." *Silvestri*, 271 F.3d at 590 (emphasis added). By his own admission, Plaintiff has committed spoliation by failing to preserve relevant documents. And the undisputed facts show that he did so intentionally. This is particularly clear when one places Plaintiff's failure to preserve and properly collect documents in the context of his efforts to tamper with witnesses, Ex. 13 (Phalen Dep.) at 199:6–203:21, 304:6–22, and hide behind phony claims of privilege here and in other cases, going so far to support those claims with false testimony. Ex. 16 (Mawdsley *REFCO* Dep.) at 10:7–9, 123:21–124:11. Accordingly, a serious sanction is warranted to punish Plaintiff's behavior, mitigate the prejudice to Defendant, and dissuade other parties in other cases from mimicking Plaintiff's conduct.

Rule 37 reserves the harshest sanction, dismissal, for cases where the conduct is most egregious. *See, e.g.*, *Slaydon*, 2016 WL 8243174, at *2–3; *Rosemond*, 2014 WL 4245974, at *9. While an argument could be made that this case warrants the harshest sanctions, Defendant is not pressing for dismissal at this juncture. Instead, Defendant argues that tailored jury instructions would strike the right balance in this case.

17

## **CONCLUSION**

For the foregoing reasons, Defendant Zero-Gravity Holdings, Inc. respectfully requests

that the Court grant this motion and that the jury be instructed that:

1)      Plaintiff improperly sought to influence witness testimony;

2)      Plaintiff failed to properly preserve documents, and if those documents had been

        properly preserved and offered into evidence, it may be presumed they would

        have been unfavorable to Plaintiff; and

3)      If the jury is asked to determine factual issues regarding the parties' meeting of

        the minds expressed in Plaintiff's Circumlunar Space Flight Purchase Agreement,

        it shall be presumed that Plaintiff was aware of the publicly-available information

        that his team's diligence would have uncovered in 2013 regarding the relationship

        and roles of Russian space program entities Energia and Roscosmos with respect

        to commercial spaceflight.

These instructions align with the issues on which Defendant was denied evidence because of

Plaintiff's intentional discovery misconduct.

Respectfully submitted,

  /s/ *R. Kennon Poteat III*            /s/ *Kevin Quilty*
Edward J. Bennett (Va. Bar No. 40118)   Deborah Baum (*pro hac vice*)
R. Kennon Poteat III (Va. Bar No. 73324) Kevin Quilty (Va. Bar No. 89501)
WILLIAMS & CONNOLLY LLP                 PILLSBURY WINTHROP SHAW PITTMAN
725 Twelfth Street, N.W.                LLP
Washington, DC 20005                    1200 Seventeenth Street, N.W.
(202) 434-5000                          Washington, DC 20036
(202) 434-5029                          (202) 663-8000
ebennett@wc.com                         deborah.baum@pillsburylaw.com
kpoteat@wc.com                          kevin.quilty@pillsburylaw.com

March 13, 2018                          *Counsel for Defendant Zero-Gravity Holdings, Inc.*

18

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of March, 2018, I will electronically file the

foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification

of such filing (NEF) to the following:

> Thomas A. Clare
> Megan L. Meier
> CLARE LOCKE LLP
> 10 Prince Street
> Alexandria, VA 22314
> (202) 628-7400
> tom@clarelocke.com
> megan@clarelocke.com
>
> Bruce G. Paulsen
> Mark D. Kotwick
> Jeffrey M. Dine
> SEWARD & KISSEL LLP
> 1 Battery Park Plaza
> New York, NY 10004
> (212) 574-1200 (T)
> paulsen@sewkis.com
> kotwick@sewkis.com
> dine@sewkis.com

      /s/ *R. Kennon Poteat III*
      R. Kennon Poteat III (Va. Bar No. 73324)
      WILLIAMS & CONNOLLY LLP
      725 Twelfth Street, N.W.
      Washington, DC 20005
      (202) 434-5000
      kpoteat@wc.com